OK. Next case is Case No. 414-0201. That's ABB, Inc. v. Tate & Lyle. And for the appellant, we have Jeffrey Young. And for the applicant, Michael Ehart. Mr. Young. Yes, sir. Please proceed. Thank you, Your Honor. May it please the Court, my name is Jeff Young. I'm in-house litigation counsel for ABB. I'm here at ProHoc. I'm a member of the North Carolina Bar. I'm a part of a settlement from the Illinois Bar. And it's an honor to be here, and I'm privileged to present the argument for ABB. I think it should be readily apparent from the briefs, I think the briefs on both sides were excellent, that we have an overarching legal issue, and that is when can a trial court circumvent or try to get around what appears to be very clear in Illinois case law on when you can read a negotiated provision out of the contract. I'm not going to give a long recitation of facts. There are a few things that I do want to highlight as part of my argument. Tate & Lyle, the defendant here, has a manufacturing facility in eastern Tennessee. They wanted to expand that facility in 2007, 2008. We are a manufacturer of a lot of things, but one of the things that we manufacture are large and medium power transformers that supply power to industrial facilities, shopping malls, all kinds of different things. And one of the things that they needed for this expansion was a custom-built spec transformer. Transformers of this size are essentially the record shows unique. They're designed to a specific set of specs. Those specs were developed by Tate & Lyle here and their engineer. Nearly impossible to put that transformer or any transformer like that into use anywhere else. In late 2008, the economy was south, and Tate & Lyle canceled the expansion. Now, they paid off a number of the other contractors on termination for convenience with the expansion, but they took a different route with us. Yes, ma'am. You put a lot of this in your brief, and I understand where you're coming from. Okay, no problem. I feel wronged, and some may agree with me, but is it really relevant to the issue of whether or not they took action that was theirs to take within the confines of this contract? You mean the motivations for the decision not to? Right. I think it does to the extent that they're arguing precision, which is an equitable remedy. It's in the contract, correct? It is, but precision is, under Illinois law, an equitable remedy. We spent the summer and fall of 2008 manufacturing that unit. They delayed the delivery date to 2009. We passed all of the first set of tests except for a noise test. It was a couple of decibels over on one of the noise tests. The only testimony in the record at the time that summary judgment was rendered was that that difference of two or three decibels in the 70-decibel range was almost imperceptible, and it did not affect the transformer operation. Can I have a question? Yes, ma'am. Because I was getting confused. My understanding is that it did not comply with what was bargained for in terms of the decibel level. Does that make sense?  I think there's a disagreement, but it was either two or three decibels off of that one test. The testimony about that is that in an industrial application, a two or three decibel difference wouldn't have mattered. It would have been almost imperceptible at 10 or 15 or 20 or 30 feet away from the transformer. We tried to get them to accept the unit at that time. They refused to do that. At our own cost, we opened up the transformer and essentially rebuilt the whole unit. The unit then, again, admittedly failed another test. It failed the applied voltage test. At that point in time, Tate and Mahler planned that they were going to try to rescind the contract. When they sent that notice, we wrote back immediately and said, wait a second, there's a cure provision in the contract. We're going to take advantage of that 10 days to cure. We cured it. We fixed the unit. We tested it again. Those were the only tests that were done on the unit were done by us. They all showed that the unit passed, and we told Tate and Mahler that the unit was ready to ship. Counsel, do you agree that both parties had attorneys negotiate in terms of this contract before it was signed? Yes, Your Honor. I'm not disputing. We're both sophisticated parties, big companies, attorneys involved. With all these lawyers and the negotiations back and forth, some way we ended up with a remedies provision which included rescission and a termination provision. That's correct. Which allowed for time for a party who had breached or partially breached to cure. That's correct, Your Honor. Okay. Why shouldn't this Court try to do what it can to give both provisions meaning? Well, and I'm going to try to do that. And I think it's honestly, Your Honor, actually our interpretation that gives both provisions meaning. Tate and Mahler's interpretation writes the cure provision completely out of the contract. It says you can't take advantage of that. But you're absolutely right, Your Honor. We're here in a situation where, frankly, we shouldn't be. Two big companies had two clauses in the contract and did not reconcile. Just floating through the voluminous record and some of the documentation exhibits, it appears that it was at least contemplated changing both the termination and the remedies provision. And yet some way, after all these negotiations, they're all still left within the contract.  I think so from this perspective, Your Honor. I'm not going to argue that the contract should be construed against one of the parties because of lack of sophistication or drafting. I don't think that's a fair read of the record. I do think a fair read of the record shows that Tate and Mahler was very anxious to get this in place, wanted to use a set of terms and conditions that had been used in Europe, I believe, which is fine. We have no problem with that. And in that set of terms and conditions, there was boilerplate language about rescission. But the only clause that I want to say was completely negotiated, but certainly ADB asked for and got the cure clause and got it inserted into the contract. So certainly I think it's fair to say that that was one clause, the cure clause, that ADB and Tate and Mahler specifically talked about. That was in the addendum. It was added. It was a change to the contract that Tate and Mahler agreed to. The rescission clause, on the other hand, was something that, frankly, we either missed or didn't change. There's any number of explanations as to why the rescission clause stayed in the contract. It's there. I'm disputing that. For purposes of the appeal here, is there any distinction to be made between rescission of the order, which is what 6.1 says, and rescission of the contract? Because throughout the presentation, we shaded in the language rescission of the contract.  I would say no, Your Honor. I think as someone who does a fair amount of that on a day-to-day basis, I don't think you can draw a distinction between the order and the contract. I think Tate and Mahler were correct on that point, that the terminology and the terms and conditions applied to the entire contract. I'm not disputing that. So, as Justice Turner has correctly pointed out, we have Section 20.1 that has a termination clause that says if there's a material breach, terminate on 10 days' notice if there's a failure to cure. And we have Section 6, which says there's a right to rescind at any time. And the trial court, of course, essentially ignored Section 20.1, which relies exclusively on Section 6, and said, in my opinion, Section 20 is out of the contract. Tate and Mahler has a right to terminate basically—or, excuse me, rescind, to use the correct word, for any deviation from spec, however minor it might be. One nut, one bolt off, wrong color paint, whatever. They can say, no, we're not taking a $750,000 custom transformer. Now, I think there are a number of hurdles that they have to get over to get to summary judgment, none of which they cross. All four of these, I think, prevent some of the entry of summary judgment in this case. And I think the primary one, and the one that I hit on to start with, is that Illinois law, like the law of most states, is very clear. The court looking at a contract can't read a provision out of that contract. And I'll answer your question in a second about interpretation, because I think there's an interpretation that keeps both of those clauses in the contract without saying, no go on the transformer. But even if that is the case, that section 20 is out, rescission still requires that there be a fundamental breach. I mean, it goes to the very heart of the contract. The record just doesn't show that here. This unit passed the test. It was ready to be shipped. Tate and Mahler also has to show that it couldn't be compensated by money damages, and also that there'd be no way to put McCarty back to the status quo in order to obtain rescission. So opposing counsel's response to those items is either by saying, well, you're talking about a situation where the court is fashioning a decision, and not a situation where the parties have bargained for this. Right. Normally entering into a contract with this type of language, does that distinction matter? I think it does, Justice White. But that's a very interesting question of law that I think both sides have spent a lot of time looking for case law to find. I think we've got one case from Ohio that supports our position that just because you say the words rescission doesn't mean that all of the law behind that, the common law on that equitable remedy, is written out of the contract. And I think that's one side of it. I think another gloss on that argument, or important point, I think, is that, for example, if the party said, I'd be entitled to an injunction if X happens in the contract, I think the court would still be required to look and see if there's irreparable harm, and go through the things that they'd have to do to reach the equitable remedy of granting an injunction. So I think merely saying the word rescission doesn't get you out of the body of case law behind it. And I think perhaps this is more theoretical than it is anything else. But as I was thinking it through over the last six months or so, I think it makes more sense to allow modifications for legal remedies, like termination. Because that's a contract, right? I mean, for a breach of contract, you get a legal remedy. Equity's different. And that's where they are. They're in the arena of equity, and the court has fashioned certain things that you have to show before you get an equitable remedy like rescission. I think on the first point about reading the termination clause out, there is one case, the Magnuson case, in Illinois. It's a very close case. The site's 183 Illinois Pellet 3D, 334. And in that case, it was about a property issue. And the contract or the contract documentation in that case had or gave one of the parties both an immediate right to possession, but also at the same time gave the other party a 10- or 15-day cure period before there could be a default. And the court looked at both of those, and one party immediately said, the court said, I want immediate possession. The cure provision needs to be read out of the contract. And the Magnuson court said, no, you can't do that.  So while I agree with Tate and Lyle, it's not directly on point because it's not a rescission remedy, it's still a situation where a cure provision ran afoul of another clause allowing a particular type of remedy. And the court in Magnuson specifically said, no, you can't do that. You have to allow the cure. And, Justice Turner, I think that's the correct interpretation. This is, I think, going back to the very first question that you asked. I think the way that this should work is after the cure period, if there's no cure, then they can terminate for material breach, and they get money damages at law. That's what you get for termination of a contract. But if they can establish the grounds for rescission, that's when they get the remedies for rescission. So at that point, they can have things put back status quo ante, as they say. So that's how it works. We have failed to meet the cure period. Okay. After that, there's two remedies, termination and rescission. Any other reading of the contract reads 20.1 out. That's the only one that I can come up with that gives interpretation to both of them as they all know it all requires. The front court identified three problems, the two defects, and then the third, the failure to shift in a timely manner. And when you get to 20.2, there's the language that you talked about in terms of the remedy condition. If the condition is not remedied within four days. Yes, Your Honor. So that would apply to the two defects that you're talking about. Correct. What about the failure to shift? I think there's a factual problem for them on that, and they never raised the issue about failure to shift on time at the time. If you go back and if you look at the rescission letter, it's solely based on the problems with the transformer, and I think the record's clear on why that was, Judge, and that's because they didn't need the transformer at the site at that point in time. But the record is clear. I mean, the parties did not have a final date here, but I think it was January of 2009 was the agreed shift date. I'm sorry, Your Honor, please continue. I was just going to say there was an agreement at the outset of the time of the order that was placed that there would be a shift date, and then the record is clear that it didn't happen. The record actually has more information than that, and what happened was there was, I believe, the original shift date was in November, and Tate and Lyle approached us, ABB, and asked for an extension. Just like Fort Worth? I think so. I think that's right. Again, there was never anything in the record during any of that time period where Tate and Lyle was writing to us and saying, You're late. You need to shift. If that had happened, it's possible we could have sped things up and cured within the 14 days or 10 days. The only thing that we got was a notice saying, You failed the test again. We're going to rescind, and we wrote back and said, No, hold on a second. We can correct that within the cure period, and we did. There never was a notification of termination or rescission based on that we had delivered. So moving to rescission, rescission, again, is an act of liberty, as Justice White and I were discussing. The case law is voluminous on what you have to show to get rescission. You have to show essentially a fundamental breach that goes to the very heart of the contract, meaning that the example here, I think, would be we delivered a transformer, and for three months it failed to work. Then at that point, what you see in the case is the court saying, Okay, I'm going to step in and put the parties back where they were. A, B, D, you come get your junk transformer, and you give your money back to Tate and Lyle. But it's at that extreme point where the contract has basically completely failed. And on the record here, now, to be fair to Tate and Lyle, they had an expert. That information did not get into the record prior to summary judgment. But the record on summary judgment was our expert saying this transformer is ready and good to go. It's fully tested. There shouldn't be any issues with it. And that leads, I think, to the third hurdle that they have with rescission. And that is the real remedy for them here is to take the unit. And if there is a problem, there's a warranty clause, and we have to fix it. And if there's damages as a result of that, as a matter of contract, they get monetary damages. In the world of transformers, if the transformer doesn't operate at a certain level, and there's not as much power going through the transformer as is expected, there's a means of calculating the amount of damages. If the defect isn't fixed and they have to fix the defect, or even if they have to go out and buy another unit, there are monetary damages that could compensate them here other than rescission. And the fourth hurdle is on the status quo. And Tate and Lyle make the same argument in their place that, hey, you've got the transformer. We've got the money. We're in the same position that we were before the contract was signed. It doesn't really work like that from our perspective. From our perspective, of course, we've got a transformer that we can't sell. Prior to signing this contract, we had horse, steel, materials, labor, ready to build a transformer that we can sell and make money on. We don't have that now. There's really no way to undo this transaction and put everybody back where they are. There's a build transformer to their spec sitting behind our facility in South Boston that nobody is interested in. Nobody is going to buy. So in order for all four of those reasons, I think that you have a trial court who was trying to do the right thing. The judge, an excellent trial judge, put a lengthy opinion. But I think he has written an opinion that, for the four reasons I've just laid out, is contrary to Illinois law. Any further questions? Seeing none, thank you. Thank you. Thank you. Thank you. May it please the court and counsel, I'm Mike Keyhart from Decatur. I represent Tate & Lyle in this case. Counsel has given you the facts of the case, and so I won't spend any time doing that. The briefs in this case suggest that this decision shakes the very foundation of contract law in Illinois. It doesn't. It's a garden variety contract case. The court correctly pointed out each side is a big company. They've dealt using this exact language before in Europe and in the U.S. The section that the court has seen here is a section 6. I might say that not only did the parties look at that, but they also struck F at the request of ABB. So ABB struck F but left everything else in there, which includes rescission. And incidentally also, I think B and D essentially together do the same thing that A does, which is to say it basically gives us the right to not accept the goats, to make them keep them. Counsel says this is an equitable remedy. I have not seen a single case in Illinois, and there aren't that many, where a contract provides for rescission, where courts refuse to give it because somehow the party did not prove that their legal remedy was inadequate. I think Judge Wright asked the question, well, isn't that the case, though, where the court on its own chooses to fashion the remedy that way? And that's exactly right. There are a few cases where the court did that, and they did take into account equitable considerations. But our position is, and the cases in Illinois support this, the court is going to interpret the language according to the ordinary meaning of that language, and they're not going to eliminate or ignore or make inoperable sections of the contract. The point is, 20.2 is not inconsistent with this at all. Basically, if we do A or B or D in this case, then we're not talking about the right of ABB to cure. It's only if we selected C, which is to say, take this and fix it. And if we did that, and if we took the position, for example, that we want you to do that, and we're giving you seven days, where 20.2 says 14 days, then I think maybe there's an issue, and the court would have to construe that. But there's no, and please keep in mind, there's nothing in this language. It basically says it is take-while, the purchaser's remedy. It's our option and our sole discretion to do these things. It doesn't say that a material breach is necessary. That's not in there. It doesn't say that we have to prove anything beyond the fact that they simply haven't delivered the item as they have. Counsel, in light of what you're saying, section 20.1 provides essentially the same remedy as subparagraph C of section 60. Right. Why isn't counsel right in that? Well, because when you're reading it, why is 20.1 not simply right out of the contract? It's already covered in 6.1. If we selected C, it would be. If we selected that remedy and said, here, fix this, then it would be. And I think we'd have to go with the 14 days that they say they have. But we didn't select that, and we don't have to. There's nothing in here that says that somehow they have a veto power over which of these things we select. It doesn't say that. There is no ambiguity in this case. Judge Little was exactly right. He took about two months under consideration, took this carefully crafted order. He basically says that there's nothing inconsistent between 6.1 and section 20. They provide each party with certain rights and remedies that apply to circumstances that may or may not arise during the contractual relationship. We don't know going into this what's going to happen. Counsel makes this sound. And, by the way, I noticed in the brief they call this failure of the test a hiccup in the case. It took them about eight and a half months to get to the point where they tested it for sound. They said, well, this is a de minimis thing. It's only a small percentage. In point of fact, the decibels are much like, you know when we talk about earthquakes and the Richter scale? A 5.1 Richter scale earthquake is far worse than a 5.0, and it's the same with decibels. It's a logarithmic approach. It's not just a tiny percentage. It does make a difference. And they said to us in December, will you waive this? We didn't say, well, we'll just waive the sound. We said we're going to insist on the specifications being complied with. Among those things, and incidentally, it was not just the sound test. This is not a benign thing that these people did. The people at ABB don't remember any instance ever before where somebody had to cut apart one of these things. And you do. You don't on both these things. This thing would sit on your head. It would take two spaces in the parking lot out here. And basically, it's self-contained, and you have to cut it apart, and you have to drain it of oil. You have to take the parts out. You have to dry them. You can see when this thing failed in December. It took them three and a half months to get to the point where they were ready to test it again. And at that time, they say, well, it passed the test. But in this case, not only did it fail once, but when they finally tested it again, they say to us, well, it passed the sound test. But by the way, it stopped running after a minute. And then we tried it again, and it stopped running again after a minute. So they had to cut it apart again and drain it and dry it. So nobody can remember even once doing it, doing it twice. Materiality is not an issue here, according to the contract. But I can tell you, the only direct evidence on this is our purchasing director said, I was afraid of it. I was afraid we were getting the money. I didn't want it. And the only other direct testimony was, while it's true we discontinued this product line that we were going to use it for, our engineer said we could use it as a backup. And they were perfectly willing to buy it under those circumstances. The court is correct. I remember Judge Little asked a question during the oral argument on this. And he says, and counsel spent a lot of time talking about motive. And we went there for the testing, so we must not have cared about it. And we knew from the start we weren't going to try to take this thing. You know, the fact of the matter is, Judge Little asked the question. He said, well, why is motive important in a contract case? And you think about it, and that's right. Now, I know there are contracts sometimes that say you should do something reasonably. Okay, there. I understand maybe motive is important. But in a contract case, this isn't this case. Motive is not at all important in the case. And they spent a lot of time, again, in their briefs trying to convince the court that we're not in good faith in this thing. We decided against it. Nothing in that language requires us to come in here and prove, and by the way, this was not a jury case. It was strictly, it is a question for the court to determine the meaning of the contract. It also looks like this contract required some kind of installment payments. None were made, and yet it doesn't appear to be the subject of litigation. It isn't, Judge. And I'm afraid to say I don't know why that unfolded that way. I guess I've never met an issue of it. We have an either. Well, you see where it would be. Yeah, well, they have an either. But, you know, the point is, with rescission, if we had made priorist payments and yet rescinded, we'd be entitled to those back. And if they delivered the machine to us and we rescinded, we'd have to give the machine back. It requires that to the extent we can, we put the parties in status quo ante. But the best we can do in this case is we keep their money, they keep their machine. But they say the machine is just a big piece of steel, I guess. It doesn't have a lot of value. No, that's what they say. And to be frank with you, in the discovery in this case, we didn't spend a lot of time exploring, well, are there universities you can give this to, the engineering department to use, or, you know, things of that sort. We didn't get into it. I mean, I could speculate on all sorts of things, but it was just never an issue. The answer, I think counsel does, and I appreciate, agree that the contract language is not construed against us. It was two equally sophisticated companies. When we gave the notice of rescission, counsel says it was strictly for the sound test and then I filled the other test. In point of fact, the letter that was sent in April basically says because you haven't provided us the machine in accordance with specifications, we are rescinding the contract. So it isn't limited just to those mechanical things. It is the fact it was due to us by January 5th and it didn't get there because of these extraordinary problems they had with producing this thing. So I think Judge Little is correct. There is no ambiguity in the case. The law is basically the court will rewrite the contract for the parties to try to give them a better deal. The court can't do that. They do make several arguments here that they can't be put in the status quo ante, so that should be a reason not to give it. But they never made that argument below. That never came up before Judge Little in any form, written or oral. The Magnuson case I do want to mention. The Magnuson case is not his case. The Magnuson case was a seller sold a tavern to a buyer, and there were about three or four contracts that formed a part of it. Lease, contract to pay payments, stock transfer. And some of those documents said something like 14 or 15 days to cure. Others gave no right to cure. So the court looked at it, and the buyer defaulted, and the seller tries to take it back and didn't give notice. And the court said basically, well, wait, we're going to take it. Look, all of these things go to the transfer of a tavern, so we're going to construe it as a whole. And there are inconsistencies, because some things you try to do you don't need notice for. You say, but there are things you do. So we're going to say bonus is required on all parts of it. But this is one contract giving us the right to make the choice which to perform. I thought about this, and I was trying to think realistically, what can I do to this section to make it ambiguous? And I don't know what I'd do to make it that way. I don't know how much clearer you can be in language to say that we have a right to do what we did. I am aware that some of these cases we've cited on rescission are old, going back to, I think, 1880s and the city of Belleville. But there are more recent cases we've cited. There's a 2011 case, appellate rescission. So it's still good law, and rescission still is a good remedy. I think I don't have anything else. So unless there are any questions, I think I'm done. I see no questions. Thank you very much. Thank you. Thank you. Yes. Just to add four points, I hope I try to make them very quickly. I think the argument was that there is no inconsistency. I think, Justice Turner, I think you pointed out right from the start. I certainly agree that there is. And I believe, again, I want to reiterate it because I think it is the only way that you can reach a consistent interpretation or interpretation of 6.1 and 20.1. And that is to say step one is cured, and then if things are not cured, then there's a divergence. And if you can prove that you're entitled to rescission, you get the rescission remedies, which are money back, machine back, those types of things. If you prove termination under 6.0 and 20.1, then you get monetary damages as a matter of law, two separate sets of remedies. Counsel, does it matter? Correct me if I'm wrong. No, go ahead. This is only ‑‑ 6.0 is only a remedy for taking a while, whereas 20.1, both of you, technically those provisions apply to both of you. I think that's correct, Your Honor. Does that make a difference? I don't think so. I mean, I don't see how that impacts our right to use a clause that we have a right to access in the contract. And, again, if you use 6.1 this way, that right to cure goes away, gone. I mean, we can argue in consistency all we want, but as a practical matter, if you read 6.1 the way taking a while is doing, the way the trial court does, we don't have a right to cure. Well, 6.1, that's just kind of additional protection that taking a while is what we bargained for then? I think it's aggressive commercial language that if the transaction had been done perfectly, we would have removed it. But instead of removing it, we got in. We specifically negotiated and specifically got in a cure period to deal with exactly this situation, where we get a letter in from them saying after a fair amount of communication, Your Honor, I think you asked about the letter, whether there was an issue about delay. Delay was never raised. The only issues that were discussed were sound and then the applied voltage test. In fact, the decision to send a termination letter, you'll see in the record, was made the day, I think, that the applied voltage test was communicated to take a while. It had nothing to do with delay. But I just don't see how that can divorce us from the remedy that when the lawyer who was looking at this looked at 20.1 and said, okay, I've got 10 days to fix a problem. And I agree, it could be drafted better by both parties. But when ABB negotiated that contract, they negotiated for 10 days to fix problems. And that's just not what was allowed here by taking a while. On materiality, I think that the argument was that the only evidence in the record on materiality was from the purchasing agent of taking a while. That's just not correct. There, of course, are the tests that show that the unit was ready to ship, both the first time with the two, three decibel sound deviation, and again, once the applied voltage issue was fixed. And more importantly, we had a very experienced transformer expert come in and testify at length about how the failures on the test floor, although they may sound problematic, at least in the transformer business, these things happen. And that this unit was ready to go come April of 2009. Thank you.  Thank you.